IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

Crystal D. Harris,          )
                              )
           Plaintiff,    )
                              )
      vs.                  )
                              )
Carolyn W. Colvin, Acting   )
Commissioner of Social Security,  )
                              )
          Defendant.   )
                              )

Civil Action No. 6:15-5052-MGL-KFM

**REPORT OF MAGISTRATE JUDGE**

      This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a)(D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

      The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

      The plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits on September 21, 2011, and December 29, 2011, respectively, alleging she became unable to work on November 1, 2009. Both claims were denied initially and on reconsideration by the Social Security Administration. On August 31, 2012, the plaintiff requested a hearing. The ALJ held a hearing on April 29, 2014, with the plaintiff, her attorney, and Pedro Roman, an impartial vocational expert,

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

appearing. After the hearing, the claimant submitted additional medical evidence (Tr. 557-59). Based on the new evidence, the claimant's representative was contacted and offered a favorable decision as of December 1, 2013, or a supplemental hearing would be necessary. The claimant's representative declined the offer, and a supplemental hearing was scheduled to determine the functional limitations based on a new diagnosis of carpal tunnel syndrome (Tr. 13). Subsequently, the plaintiff submitted the results of a nerve conduction study (Tr. 560-63). The supplemental hearing was held on August 25, 2014, at which the plaintiff, her attorney, and Allan S. Billehaus, an impartial vocational expert, appeared. The ALJ considered the case *de novo* and on September 25, 2014, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on October 30, 2015. The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

(1)    The claimant meets the insured status requirements of the Social Security Act through March 31, 2013.

(2)    The claimant has not engaged in substantial gainful activity since November 1, 2009, the alleged onset date (20 C.F.R §§ 404.1571 *et seq.*, and 416.971 *et seq.*).

(3)    The claimant has the following severe impairments: degenerative disc disease, lumbar and cervical spine; headaches; carpel tunnel syndrome (20 C.F.R. §§ 404.1520(c) and 416.920(c)).

(4)    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 416.920(d), 416.925 and 416.926).

(5)    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light

2

work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b). I specifically find the claimant can lift or carry 20 pounds occasionally and 10 pounds frequently, and she can stand or walk, each, for 2 out of 8 hours in a workday and sit for 6 out of 8 hours. She needs a sit/stand option and can walk, sit, and stand for 30-minute increments. The sit/stand option would not interfere with attending at the workstation. I also find that she can only occasionally push or pull in her lower extremities. She can never climb ropes, stoop, or be around hazards. She can occasionally climb, balance, kneel, and crouch, and crawl, but she can frequently reach overhead, and frequently handle and finger. In addition, she should avoid concentrated exposure to temperature extremes.

(6)    The claimant is unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

(7)    The claimant was born on April 13, 1967, and was 42 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. §§ 404.1563 and 416.963).

(8)    The claimant has a limited education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).

(9)    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*see* SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

(10)    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969 and 416.969(a)).

(11)    The claimant has not been under a disability, as defined in the Social Security Act, from November 1, 2009, through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

3

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He

4

must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is

substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was 42 years old on her alleged disability onset date (November 1, 2009) and was 47 years old on the date of the ALJ's decision (September 25, 2014). She has a tenth grade education (Tr. 13) and past relevant work experience as a cook and food service manager (Tr. 28).

William Hunter, M.D., of the Carolinas Neuroscience & Spine Center, ordered an MRI that was performed on February 3, 2010, which showed a disc herniation in the plaintiff's lower lumbar spine at L5-S1 and a small focus of increased T2-weighted signal within the cortex of the right kidney, most likely representing a cyst (Tr. 411). On March 17, 2010, Dr. Hunter evaluated the plaintiff for a long history of posterior cervical and lumbar pain. The plaintiff reported continued lower back pain with bilateral leg pain. Prior chiropractic treatment had been helping, but she developed persistent pain issues. Dr. Hunter noted that the plaintiff had undergone a trial of injections without significant benefit. Dr. Hunter noted a history of hypothyroidism and mental illness, and he reviewed the plaintiff's recent MRI. Dr. Hunter found the plaintiff to be mildly tender over her cervical midline, paracervical region, and trapezius muscles. The plaintiff was tender over her lumbar midline, bilateral sacroiliac joints, and sciatic notches. Dr. Hunter recommended a trial of physical therapy and started the plaintiff on a mild analgesic, muscle relaxant, and anti-inflammatory (Tr. 412-13).

On March 23, 2010, and April 5, 2010, the plaintiff underwent lumbar translaminar epidural steroid injections (Tr. 414, 415).

On May 5, 2010, Dr. Hunter evaluated the plaintiff for continued difficulties with low back pain, hip pain, buttock pain, and left-sided leg pain. He also noted that the plaintiff had numbness, tingling, and a burning sensation. Dr. Hunter indicated that the plaintiff's various treatments had not been helpful. He noted that the plaintiff appeared to

be in obvious discomfort.  She was neurologically weak with plantar and dorsiflexion on the left compared to the right.  She had decreased sensation in her S1 dermatomal distribution and decreased ankle jerk on the left.  Dr. Hunter detailed surgical options, and the plaintiff agreed to undergo surgery (Tr. 416).

On July 8, 2010, Dr. Hunter performed left-sided L5-S1 hemilaminectomy, diskectomy, and foraminotomy of the L5 nerve root and foraminotomy of the S1 nerve root (Tr. 336, 417-424).

On August 4, 2010, Dr. Hunter evaluated the plaintiff for surgery followup.  He noted that the plaintiff was doing much better but was still quite hesitant to do any activities.  The plaintiff was tender over her lumbar midline, left sacroiliac joint, and sciatic notch on the left. Dr. Hunter advised the plaintiff to gradually increase her daily activities and ordered physical therapy (Tr. 425).

When the plaintiff returned to Dr. Hunter on September 7, 2010, he noted that she had intermittent lower back, left hip, and buttock pain and that today it was zero out of ten (Tr. 336).  On examination, Dr. Hunter found that the plaintiff's muscle strength was a maximum five out of five, her reflexes were symmetric and intact, and her sensation was intact.  She had minimal tenderness over her lumbar midline, sacroiliac joint, and sciatic notch.  Dr. Hunter encouraged the plaintiff to continue physical therapy and her home exercise program.  He stated that "it is reasonable for her to start a new job working as a cashier" (*id*.)

On November 2, 2010, the plaintiff complained of worsening lower back pain, hip pain, buttock pain, and leg pains.  She reported falling several times due to left leg numbness.  Dr. Hunter noted that the plaintiff's son had recently passed away suddenly and that the plaintiff had a lot of difficulties with her back and leg after "caring for her son's issues."   Dr. Hunter indicated that the plaintiff had weakness in plantar flexion and dorsiflexion on the left compared to the right, and she also had decreased sensation on the left compared to the right.  Dr. Hunter ordered diagnostic tests (Tr. 335).

On November 4, 2010, the plaintiff had a lumbar MRI that showed post-surgical changes at the L5-S1 disc space, perineural scarring or fibrosis traversing the left S1 nerve root, post-surgical changes at the left posterolateral L5-S1 disc, and a moderately large left paracentral to far left lateral disc protrusion. X-rays of the plaintiff's hips were normal (Tr. 332-34).

On November 18, 2010, the plaintiff underwent a left L5-S1 nerve root block injection (Tr. 331).

On November 22, 2011, Husam Mourtada, M.D., performed a consultative examination of the plaintiff at the Commissioner's request. Dr. Mourtada noted that the plaintiff stopped taking medications in June 2011 because she had no insurance or money. He noted that the plaintiff had a bladder tack and sling done in 2006, gastroesophageal reflux disease ("GERD"), and chronic back pain since 1997. Dr. Mourtada noted that the plaintiff had back surgery in July 2010, which did not help. The plaintiff reported continued low back pain that was severe across her lumbar spine and radiated down her legs to her feet with tingling, numbness, and weakness. The plaintiff rated her pain at nine out of ten and described it as sharp. The plaintiff reported that her pain was worse with any activity and slightly better with resting and changing position. Dr. Mourtada reviewed the plaintiff's November 2010 MRI. On examination, he found the plaintiff to have motor strength of 5/5 for the major muscles of her upper extremities and 4/5 for the major muscles of her lower extremities. The plaintiff's straight leg raise was negative but caused global pain over her lumbar spine without radiation. The plaintiff had diminished deep tendon reflexes all over both upper and lower extremities. She had impaired sensation for light touch over the whole left lower extremity. Dr. Mourtada found decreased lumbar lordosis. He noted a healed surgical scar over the plaintiff's lower lumbar spine. The plaintiff's whole lumbar spine was tender to palpation with limited range of motion. The plaintiff was unable to get on the exam table, but had at least 90-degree flexion of both the hips and knees. The plaintiff walked slowly and could not heel walk, toe walk, or squat. Dr. Mourtada indicated that the plaintiff's gait was slow and antalgic. Dr. Mourtada's assessment was: 1) This is

8

a 44-year-old, white female, left-handed with hyperthyroidism.  She is not taking any medication because she has no insurance and no money; 2)  She has a history of bladder tack and left kidney cyst; 3)  GERD/irritable bowel syndrome; 4)  Chronic low back pain with history of left L5·S1 microdiskectomy on July 08, 2010, with chronic severe pain; and 5) the examinee will be able to manage her funds independently if granted to her (Tr. 554-56).

On December 20, 2011, a medical consultant on contract to the Administration completed a Physical Residual Functional Capacity ("RFC") Assessment indicating that the plaintiff was capable of performing light work with postural and environmental limitations (Tr. 108-10).

On January 31, 2012, after securing Medicaid, the plaintiff began treatment at Landrum Family Health Care.  On this date, Linda M. Hightower, FNP, evaluated the plaintiff and reviewed her medical history.  The plaintiff rated her back pain at eight out of ten.  The plaintiff also reported chronic migraines, eye floaters, bilateral ear ringing, and insomnia.  Ms. Hightower indicated that the plaintiff had positive straight leg raise on examination.  The plaintiff's diagnoses included gastrointestinal disorder reflux, left kidney cyst, thyroid disorder, questionable diabetes, backache, anxiety, and depression.  Ms. Hightower ordered bloodwork and prescribed mirtazapine, levothyroxine, tizanidine, omeprazole, and Advil 200.  Ms. Hightower explained that the plaintiff had a complex medical history and that they would try to help the plaintiff  with her top three issues.  Ms. Hightower also recommended counseling (Tr. 352-55, 381-84).

On February 14, 2012, Ms. Hightower evaluated the plaintiff  for depression, anxiety, thyroid problems, and insomnia.  The plaintiff  reported back pain of eight out of ten and bilateral hip pain.  Ms. Hightower noted that the plaintiff had tingling in her hands and lower legs and feet as well as sciatic pain radiating down her left hip.  The plaintiff had abnormal hypo reflexes in her left lower extremity and tenderness to palpation in her sacral and lumbar spines.  The plaintiff also had abdominal tenderness and genitourinary symptoms of increased frequency.  Ms. Hightower diagnosed diffuse abdominal pain,

polyuria, and lower back pain. Ms. Hightower prescribed alprazolam and advised continued counseling (Tr. 376-78).

On February 15, 2012, Tara Horne, LPC, of The Center for Counseling, evaluated the plaintiff. Ms. Horne elicited a detailed history noting the plaintiff's treatment for physical problems and recent life stressors including the deaths of her son and of her grandmother and another son's incarceration. The plaintiff's symptoms included anger, anxiety, confusion, change in sleep patterns, hopelessness, agitation, irritability, fatigue, disorganized thoughts, difficulty with memorization or concentration, generalized stress, family stress, and traumatic stress. Ms. Horne indicated that the plaintiff had a flat affect and a cooperative but somewhat somber mood. Ms. Horne diagnosed major depression, panic disorder, and anxiety. Individual therapy was recommended. (Tr. 347-51).

On February 16, 2012, the plaintiff had an abdominal ultrasound due to abdominal pains which showed a small right renal cyst (Tr. 337).

On February 28, 2012, Ms. Hightower evaluated the plaintiff. The plaintiff reported that her therapist suggested an increase in her dose of alprazolam. She rated her back pain at seven out of ten and reported arthralgias in her hips and knees. Ms. Hightower indicated that the plaintiff had lumbar pain with palpation. She reviewed the plaintiff's blood work and adjusted and refilled her medications. Ms. Hightower also recommended continued counseling (Tr. 369-74).

On March 28, 2012, the plaintiff reported feeling like her Celexa was working and she was noted to have attended two counseling sessions since her last visit. The plaintiff rated her back pain at six out of ten, and she complained that the soles of her feet burned and hurt at the arches. Ms. Hightower noted that the plaintiff had facial grimaces when stepping up to get on the examination table. She found the plaintiff to have positive straight leg raise bilaterally and tenderness to palpation in the lumbar spine. Ms. Hightower instructed the plaintiff on back exercises and adjusted her medications (Tr. 364-68).

On May 1, 2012, the plaintiff reported passing out with a seizure on April 28, 2012, and awaking with a severe headache. She reported that later that day she had

another episode where she awoke with her son and husband holding her. The plaintiff's husband indicated that she had suddenly passed out and then had a full seizure lasting one to two minutes. The plaintiff reported having a dull headache in her neck area since that time (Tr. 359-61).

On May 25, 2012, the plaintiff was referred by Ms. Hightower to the Neurology Centers of the Carolinas for evaluation of "menstrual related" headaches (Tr. 399). Robbie Buechler, M.D., ordered an ambulatory EEG study from June 9th to 11th that was normal, as was her neurological examination (Tr. 469-70). The plaintiff also alleged that she had a "seizure" in the presence of her husband in 2012, but Dr. Buechler noted that the plaintiff's MRI of the brain was normal, her neurological evaluation was normal, and she testified at the hearing that she had not experienced any other similar seizures. The plaintiff detailed the episodes from April and reported having problems with considerable headaches on and off for a long time. On examination, the plaintiff had considerable paraspinal tightness and mild numbness in the left thumb into the index fingers consistent with a possible C5-6 radiculopathy versus carpal tunnel syndrome. Dr. Buechler noted that the plaintiff's symptoms could be from multiple causes, and he ordered diagnostic tests. (Tr. 92, 399-401).

On May 31, 2012, at the request of the state agency, psychologist Ron Thompson, Ph.D., performed a mental status evaluation of the plaintiff and noted an aura of anger and a depressed mood. The plaintiff was able to complete serial seven subtractions correctly and say the months of the year backwards correctly. The plaintiff reported that she had experienced crying spells since the deaths of her son in October 2010 and her grandmother four months later. She was also experiencing stress because her grandfather was recently diagnosed with Alzheimer's disease, and her mother, who had experienced three strokes, had moved in with her. She stated that she was "at my wits end – I can't handle it anymore." Dr. Thompson diagnosed bereavement and adjustment disorder with major depressive features, moderate. Dr. Thompson concluded that the plaintiff was in mild psychiatric distress and was caught up in bereavement, and that,

combined with chronic low back pain and headaches, would create some moderate impairment and functionality for her, but he deferred to the medical community on the issue of low back pain (Tr. 402-404).

On June 1, 2012, an MRI of the plaintiff's cervical spine showed a shallow posterior focal central disc protrusion at the C5-6 level, with no compression fractures and no spondylolisthesis (Tr. 467).

On June 15, 2012, Thomas Eison, M.D., of Village Orthopedic Surgery, evaluated the plaintiff for complaints of back pain radiating into her left leg. Dr. Eison noted that the plaintiff had previously undergone a left hemilaminectomy by Dr. Hunter in 2010. Dr. Eison noted that the plaintiff's 2010 MRI showed post-surgical changes and a large left paracentral lateral disc protrusion. The plaintiff reported not being back to Dr. Hunter since a nerve block in November 2010. Dr. Eison noted that the plaintiff had applied for disability. The plaintiff reported continued back pain since surgery with radicular pain in her left leg. She also complained of a "sore tailbone." The plaintiff rated her pain as ten out of ten. Her review of systems also included complaints of diarrhea, joint swelling, depression, and thyroid disease. Lumbar spine x-rays showed decreased disc space height at L5-S1, minimal degenerative changes at her facet joints, and calcification in the anterior major vessel. On examination, the plaintiff could only squat about 50% of normal. She could only bend over to about four inches from her ankles. The plaintiff had good range of motion in her hips and knees. Straight leg raise was positive on the left. She had tenderness of the coccyx. Dr. Eison indicated that the plaintiff walked with a very slow gait. His impression was that the plaintiff had residual radiculopathy of the left lower extremity associated with her far lateral herniated L5-S1 disc and coccydynia. Dr. Eison ordered an updated MRI (Tr. 405-408).

On June 18, 2012, an electromyography test report ordered by Ms. Hightower indicated that the plaintiff's bilateral upper and left lower extremities were normal. Nerve conduction studies were consistent with C-6 radiculopathy (Tr. 505-506). On examination, the plaintiff had normal sensation and strength, and her gait and stance were also normal

(Tr. 509). Ms. Hightower renewed the plaintiff's medication and advised the plaintiff that she had no restriction on physical activity (Tr. 511).

On July 5, 2012, the Administration's non-examining consultant, Craig Horn, Ph.D., completed a Psychiatric Review Technique Questionnaire form and Mental RFC Assessment, which indicated that the plaintiff's medically determinable mental impairments caused mild restriction in daily activities, mild difficulties in maintaining social functioning, and moderate difficulties in concentration, persistence, or pace (Tr. 120-21, 124-26).

On July 6 and 23, 2012, lumbar MRIs showed a left L5-S1 protruding disc, a laminectomy defect, and a disc herniation (Tr. 409, 411). The MRI report of July 16, 2012, indicated a left lateral recess protruded disc abutting the descending left S1 nerve with possible laminotomy defect (Tr. 409). Dr. Eison noted on July 23, 2012, that the plaintiff's symptoms were mostly on the left side but that she had begun having some symptoms on the right side. Dr. Eison indicated that he doubted that further pain management would give improvement, and he requested that his partner evaluate the plaintiff for a surgical consultation. Dr. Eison prescribed Lortab (Tr. 444-45).

On July 25, 2012, a medical consultant on contract to the Administration, Seham El-Ibiary, M.D., completed a Physical RFC Assessment indicating that the plaintiff was capable of performing light work with postural and environmental limitations (Tr. 122-24).

On August 3, 2012, Sanjitpal Gill, M.D., of Village Orthopedic Surgery, evaluated the plaintiff for an initial evaluation and elicited a detailed history from her. The plaintiff reported back pain, left leg problems, and bladder dysfunction. She explained that she still loses control of her bladder and that this had been going on for over a year. Dr. Gill indicated that the plaintiff had markedly decreased disc height at L5-S1 and also had a very large disc herniation at L5-S1. Dr. Gill found the plaintiff to have some subtle weakness of the tibialis anterior and EHL on the left side. She had had trace reflex. Dr. Gill found tenderness to palpation and limited range of motion. He noted that the plaintiff had applied

13

for disability. Dr. Gill recommended pain management, and he ordered diagnostic tests (Tr. 446-57).

On August 7, 2012, Ms. Hightower evaluated the plaintiff and reviewed her medications.  The plaintiff reported headaches and back pain.  Ms. Hightower continued the plaintiff's current treatment regimen and refilled her medications (Tr. 507-509).

On August 9, 2012, the plaintiff had a lumbar CT Scan and MRI that showed a large left paracentral, left posterior lateral disc extrusion at L5-Sl with mass effect upon the descending left Sl nerve root and resultant thickening of the nerve root; and multilevel degenerative changes at additional levels (Tr 457-60).

On August 17, 2012, Dr. Gill re-evaluated the plaintiff and reviewed her MRI. He indicated that he did not think that surgery would be helpful since he felt that her nerve damage was permanent at that point.  He indicated that the plaintiff might need a decompression and fusion but explained that this might not help and could actually make her worse.  Dr. Gill advised smoking cessation and indicated that he would reevaluate the plaintiff in four to five weeks (Tr. 461-63).

On August 27, 2012, Dr. Mourtada evaluated the plaintiff for pain across her low back, worse on the left, which occasionally radiated down the back of both legs to her feet.  The plaintiff reported weakness, left greater than right, and tingling, numbness, and muscle spasms in her low back.  The plaintiff reported occasional incontinence.  She rated her pain at seven out of ten and described it as waxing and waning.  She indicated that her pain was worse with sitting, standing, any activity, bending, and lifting.  Dr. Mourtada noted the plaintiff's August 9, 2012, MRI findings.  Dr. Mourtada found the plaintiff to be very tender across her lower lumbar spine.  Her motor strength was 4/5 in both lower extremities. Dr. Mourtada noted that the plaintiff had already failed physical therapy, surgical intervention, and spinal injections.  He diagnosed low back pain and prescribed Zanaflex, Advil, and Lortab (Tr. 431-33).

On August 31, 2012, the plaintiff underwent a cervical epidural steroid injection (Tr. 471-72).

14

On September 12, 2012, Dr. Mourtada evaluated the plaintiff for continued low back pain.  The plaintiff rated her back pain at eight out of ten.  On examination, the plaintiff had reduced lordosis and limited range of motion in her lumbar spine.  She was very tender across her lower lumbar spine and had reduced motor strength in the major muscles of her lower extremities.  Dr. Mourtada noted that the goal was to reduce the plaintiff's pain and improve her function.  He continued her current medications (Tr. 441-43).

On October 12, 2012, Dr. Gill evaluated the plaintiff.  He indicated that the plaintiff suffered from headaches for several weeks following the injection given by Dr. Mourtada and that she wanted to see a different pain doctor.  Dr. Gill recommended an injection by Dr. Friedman, who had given the plaintiff cervical injections in the past in an effort to maximize non-operative care since the plaintiff's prior surgery was not helpful and he was unsure that additional surgery would be beneficial (Tr. 464-66).

On November 15, 2012, Ms. Hightower evaluated the plaintiff and refilled her tizanidine and mirtazapine (Tr. 510-11).  On December 6, 2012, the plaintiff complained of an overactive bladder, reporting that she could go to the bathroom 15 to 20 times a day, and she reported mild stress incontinence.  Ms. Hightower noted that the plaintiff had a bladder sling procedure in 2007.  The plaintiff's review of symptoms was positive for fatigue and chronic musculoskeletal pain.  Ms. Hightower found tenderness to palpitation in the plaintiff's lumbar sacral region.  She referred the plaintiff for a urology consultation and ordered a thyroid ultrasound (Tr. 514-17).

On January 24, 2013, Dr. Buechler evaluated the plaintiff for some seizures or spells of passing out with shortness of breath and dizziness but that did not quite seem seizure-like.  He noted that the plaintiff also had some cervical injections for her cervical radiculopathy and stenosis at C5-6.  The plaintiff reported low back pain and requested that Dr. Buechler complete a functional capacity evaluation, but he explained that he did not do those types of evaluations.  Dr. Buechler found the plaintiff to have some mild antalgia with gait.  The plaintiff had some pain and patchy sensory dysesthesia into her legs, as well as paraspinal tightness in her back.  Dr. Buechler also noted some significant arthritic changes

in the plaintiff's hands and back.  Dr. Buechler indicated that he would have a second opinion for back surgery reviewed by a neurosurgeon.  He started the plaintiff on Neurontin and continued her on Flexeril (Tr. 472-74).

On February 11, 2013, Ms. Hightower evaluated the plaintiff.  The plaintiff reported that she was scheduled to see a urologist, and she continued to complain of chronic back pain.  Ms. Hightower refilled the plaintiff's tizanidine for muscle spasms (Tr. 535-37).

On February 21, 2013, Christopher J. Chittum, M.D., of Upstate Spine and Neurosurgery Center, evaluated the plaintiff for low back pain.  Dr. Chittum noted the plaintiff's history. She reported that her pain was moderate to severe.  She indicated that her pain was in her lower back and radiated down her left leg.  She reported that her pain was aggravated by daily activities, bending, twisting, standing, and walking.  Dr. Chittum noted associated paresthesias, numbness, and weakness.  He also noted the plaintiff's complaints of urinary incontinence, all over joint pain, anxiety, depression, and nervousness.  Dr. Chittum found the plaintiff to have some decreased reflexes, reduced lower extremity strength, moderate tenderness to palpation at the S1 joint, and bilateral positive straight leg raise.  He diagnosed a lumbar disc herniation, low back pain, lumbar instability, lumbosacral neuritis, and lumbar degenerative disc disease.  Dr. Chittum indicated that the plaintiff had a very large left L5-S1 recurrent herniated disc with severe degenerative disc disease and severe compression of the left exiting nerve root with obliteration of the neuroforamen.  He recommended surgery (Tr. 479-81).  On March 12, 2013, Dr. Chittum reevaluated the plaintiff.  The plaintiff's physical examination was unchanged, and Dr. Chittum scheduled surgery (Tr. 482-84).

On March 25, 2013, Dr. Chittum  performed a fusion at L5-S1 to decompress and stabilize the discs (Tr. 485-86).  Two weeks after the surgery, on April 9, 2013, Chalmers A. Mills, PA-C, Dr. Chittum's physician's assistant, examined the plaintiff and found normal neurologic sensation and reflexes, normal strength in all of her muscles, and that the lumbar incision was healing well.  He noted that the plaintiff had a deliberate gait.

The plaintiff also had positive straight leg raise on the right. Mr. Mills recommended physical therapy and advised the plaintiff to slowly advance her activity level as tolerated. (Tr. 489). At a followup on May 7, 2013, Mr. Mills noted that the plaintiff reported right lower extremity pain less pronounced than her last visit and that her lumbar spine x-rays were stable (Tr. 490). Mr. Mills noted that the plaintiff had not yet started physical therapy, which he again recommended, and he advised her to continue wearing her lumbar support brace (Tr. 490). On May 23, 2013, and June 24, 2013, Dr. Chittum's office prescribed Norco (Tr. 491, 492).

On June 18, 2013, Kurt Garber, DPT, a physical therapist, completed a form on which he indicated that the plaintiff could lift 20 pounds occasionally and less than ten pounds frequently, walk and stand less than two hours, sit less than two hours, and needed to change positions every 30 minutes (Tr. 475-78). Dr. Garber offered an opinion that the plaintiff should never stoop or climb ladders and that "L5-S1 ruptured disc, herniated disc, nerve damage, arthritis, and neuropathy" affected her ability to perform sustained forward reaching and repeated overhead reaching (Tr. 476). Dr. Garber also offered the opinion that the plaintiff should not balance, could only kneel occasionally, was unable to crawl, and would be absent more than three times a month (Tr. 476-77).

On June 25, 2013, during a three-month post-operative followup, Dr. Chittum noted that the plaintiff was "doing well with walking and getting up and down in exam room" (Tr. 493). An x-ray of her lower spine was "good." Dr. Chittum reported no postoperative complications and that her symptoms were improved, her pain had been "mild," and that she could wean out of her lumbar brace (*id.*).

On June 26, 2013, Ms. Hightower evaluated the plaintiff and reviewed her recent blood tests. The plaintiff had costovertebral angle tenderness and abdominal tenderness on examination. Ms. Hightower diagnosed hematuria, dysuria, and primary hypothyroidism. She reviewed and continued the plaintiff's medications (Tr. 540-42).

On July 23, 2013 and August 22, 2013, Dr. Chittum's office refilled the plaintiff's prescription for Norco (Tr. 494, 495). On August 21, 2013, Ms. Hightower

evaluated the plaintiff for followup of her multiple medical conditions. She noted that the plaintiff had abnormal glucose levels and ordered additional blood work (Tr. 543-44).

On August 27, 2013, Mr. Mills examined the plaintiff and noted that she was attempting to secure disability. The plaintiff complained of numbness in her hands and feet and persistent pain throughout her spine. Mr. Mills noted that the plaintiff's symptoms were slightly worse compared to preoperative levels and that her postoperative pain was moderate. The plaintiff reported that she continued to use her lumbar brace when she was in a motor vehicle. Mr. Mills indicated that the plaintiff had decreased sensation in her extremities and decreased reflexes. The plaintiff had mild and generalized tenderness in her cervical spine and moderate tenderness in her lower lumbar spine. The plaintiff's range of motion testing was limited due to guarding from pain. Mr. Mills ordered an MRI of the plaintiff's lumbar spine to confirm a stable L5/S1 fusion and noted the plaintiff's complaint of neck pain (Tr. 496). A CT scan of her cervical spine showed a very small C5-6 bulge that was not touching any nerves (Tr. 501). On September 3, 2013, a CT exam report indicated post-surgical changes at L5-S1, with soft tissue density along the left side of the thecal sac that may be affecting the left S1 root (Tr. 499-500).

At a followup on October 1, 2013, Dr. Chittum found that the plaintiff had some tenderness on palpation of the lumbar spine, but the Hoffman sign was negative, and the foraminal compression/Spurling's test was negative (Tr. 501-02). Dr. Chittum noted that a CT scan of the plaintiff's spine showed the beginnings of fusion at the interbody and laminar graft sites and that a CT scan of her neck showed a very small C5-6 bulge that was not touching any nerves (Tr. 501). Dr. Chittum found the plaintiff to have decreased sensation in her extremities and decreased reflexes. The plaintiff had mild and generalized tenderness in her cervical spine and moderate tenderness in her lower lumbar spine. Her range of motion testing was limited due to guarding from pain. Dr. Chittum advised the plaintiff that nothing surgical needed to be done for her complaint of neck and back pain and recommended pain management and possibly a rheumatology workup (Tr. 502).

On March 25, 2014, Jeffrey P. Smith, M.D., another physician in Dr. Chittum's

18

office, evaluated the plaintiff for chronic neck and back pain. Dr. Smith noted that plaintiff had been diagnosed with carpal tunnel and had not received relief with wearing hand splints. He noted that plaintiff's hand symptoms had significantly worsened over the past three to four months. Dr. Smith started plaintiff on a trial of Neurontin 100 mg (Tr. 558-59).

On March 27, 2014, Dr. Chittum completed a Medical Opinion Re: Ability to Do Work-Related Activities (Physical) form, listing the identical limitations that Dr. Garber had listed on his form dated June 18, 2013, with similar reasons for the limitations (Tr. 550-53).

On May 22, 2014, Dr. Smith performed nerve conduction studies on the plaintiff's upper extremities, which revealed a normal study, with no electrophysiological evidence of radiculopathy, plexopathy, or neuropathy affecting the upper extremities (Tr. 560-62).

### Administrative Hearings

At the hearing on April 29, 2014, the ALJ asked the vocational expert to consider a hypothetical individual who needed a sit/stand option every 30 minutes, but retained the capability to lift 20 pounds occasionally and ten pounds frequently, could stand two hours and sit for six hours (Tr. 75). The ALJ further limited the hypothetical individual to only occasional pushing and pulling with the lower extremities, occasional climbing, balancing, kneeling, crouching, never climbing ropes, ladders or stooping, and no exposure to temperature extremes (*id*.). The vocational expert testified that the hypothetical individual would not be able to return to the plaintiff's past work, but could perform the sedentary, unskilled jobs of assembler, charge account clerk, and telephone quotation clerk (Tr. 75-76). The vocational expert indicated that his opinion was consistent with the information in the *Dictionary of Occupational Titles* ("*DOT*") except for his testimony related to the sit/stand option, which was based on his experience (Tr. 76). Next, the ALJ asked if there would be any difference in the vocational expert's answers if the walking in hypothetical one "could only be done 15 minutes at a time" (*id*.). The vocational expert indicated that there would be no change (Tr. 77).

The ALJ's next hypothetical was the same as the second question with the modification that the person would have:

> interruptions from the workstation, this is something that would occur on a daily basis. The duration of the absences would be in the sole discretion of this individual. By way of illustration, this individual may experience pain that would be of the dimension that it would be distracting from performance of work, or cause abandonment of performing the task. It could occur minutes one day, it could be hours another day, it could be an entire day, maybe multiple days per month.

(Tr. 77). The vocational expert responded, "My answer would be that there would be no work in the local and/or national economy based on these facts." (*id*.).

The plaintiff's attorney asked about a modification in the "hypothetical individual's ability or length of time they could sit during the day, and we reduced that down to four hours, even." The vocational expert responded that this did not add up to the regulations requirement of an eight-hour workday and would not allow any work (Tr. 78).

At the second hearing on August 25, 2014, the ALJ asked the vocational expert whether there would be work available for a hypothetical individual with the plaintiff's RFC. The vocational expert identified the sedentary job of telephone solicitor (245,000 jobs exist in the national economy); the light duty job of sales clerk (386,500 jobs exist in the national economy); and the light duty job of driver (170,000 jobs in the national economy). The ALJ inquired whether a limitation to frequent fingering would prevent the individual from performing these jobs; the vocational expert replied that it would not (Tr. 96-98). All three jobs have a specific vocational preparation time of 3 (Tr. 96-97), which requires over one month up to and including three months of preparation time. *See DOT* (4th Ed., Rev. 1991), available at 1991 WL 672624 (*DOT* # 299.357-014, telephone solicitor), 1991 WL 672554 (*DOT* # 290.477-014, sales clerk), and 1991 WL 672966 (*DOT* # 359.673-010, driver).

20

## **ANALYSIS**

The plaintiff argues that the ALJ erred in evaluating the opinion evidence and that reversal and award of benefits, rather than remand, is appropriate.

### *Opinion Evidence*

The plaintiff argues that the ALJ failed to properly evaluate the opinions of consultative examiner Dr. Thompson, treating neurosurgeon Dr. Chittum, and physical therapist Dr. Garber[2] (doc. 14 at 23-37). The regulations require that all medical opinions in a case be considered, 20 C.F.R. §§ 404.1527(b), 416.927(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the examining relationship; (2) the length of the treatment relationship and the frequency of the examinations; (3) the nature and extent of the treatment relationship; (4) the evidence with which the physician supports his opinion; (5) the consistency of the opinion; and (6) whether the physician is a specialist in the area in which he is rendering an opinion. *Id.* §§ 404.1527(c)(1)-(5), 416.927(c)(1)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). However, statements that a patient is "disabled" or "unable to work" or similar assertions are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5. As stated in SSR 96-2p:

_____

[2]The plaintiff's counsel refers to Dr. Garber as "Dr. Gardner" (doc. 14 at 35-37).

> [A] finding that a treating source medical opinion is not
> well-supported by medically acceptable clinical and laboratory
> diagnostic techniques or is inconsistent with the other
> substantial evidence in the case record means only that the
> opinion is not entitled to "controlling weight," not that the
> opinion should be rejected. Treating source medical opinions
> are still entitled to deference and must be weighed using all of
> the factors provided in 20 C.F.R. §§ 404.1527 and 416.927. In
> many cases, a treating source's medical opinion will be entitled
> to the greatest weight and should be adopted, even if it does
> not meet the test for controlling weight.

*Id.* at *4.

### *Dr. Thompson*

On May 31, 2012, at the request of the state agency, psychologist Dr. Thompson performed a mental status evaluation of the plaintiff. He diagnosed bereavement and "adjustment disorder with major depressive features, moderate." He stated that the plaintiff was in mild psychiatric distress and was caught up in bereavement, and that this, combined with chronic low back pain and headaches, would create some moderate impairment and functionality for her (Tr. 402-404). Dr. Thompson concluded that the plaintiff

> would have difficulty in a typical work environment maintaining
> pace and persistence in simple repetitive tasks for following
> more complicated directions as her stress coping skills appear
> minimal and psychological factors quite likely would intensify to
> the point that she would have problems staying on task and
> there would be frequent task interruption.

(Tr. 404).

In the decision, the ALJ noted that Dr. Thompson stated the plaintiff was, at the time of the evaluation, "caught up in bereavement" (Tr. 25; *see* Tr.403). The ALJ also noted Dr. Thompson's opinion that the plaintiff would have difficulty maintaining pace and persistence (Tr. 25). However, as argued by the plaintiff, the ALJ did not state what weight the opinion was given. The plaintiff argues that this omission is particularly important because the ALJ found the plaintiff could perform the jobs of telephone solicitor, sales clerk,

and driver (Tr. 29), all of which have a specific vocational preparation ("SVP") time of 3 (Tr. 96-97), which corresponds to semi-skilled work.  SSR 00-4p, 2000 WL 1898704, at *3. The plaintiff argues:

> Common sense dictates that the uncontradicted limitations in the ability to maintain concentration, persistence or pace, such as those consistently found by Dr. Thompson (Tr. 402-404) and the Commissioner's own non-examining source, Dr. Horn (Tr. 120-21) would impact any semi-skilled occupation.  The ALJ failed to weigh Dr. Thompson's opinion and rejected Dr. Horn's opinion (Tr. 27). Therefore, remand is required for proper analysis of the opinion evidence . . . .

(Doc. 14 at 34-35).  The undersigned agrees.

The Commissioner argues that remand for consideration of Dr. Thompson's opinion is not required because Dr. Thompson's evaluation does not support the plaintiff's claim that she could not perform the jobs identified by the vocational expert due to the level of concentration required to perform those semi-skilled jobs (doc. 15 at 15).  As noted by the plaintiff in her reply, however, this is *post-hoc* rationalization not included in the decision. *See Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir.2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ.").  As The Honorable Richard Mark Gergel, United States District Judge, has explained:

> "We cannot determine if findings are unsupported by substantial evidence unless the [Commissioner] explicitly indicates the weight given to all of the relevant evidence." *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir.1984). This requires the Commissioner "to indicate explicitly the weight accorded to the various medical reports in the record." *Id.* at 236; *see also, DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir.1983) ("The Secretary must present us with findings and determinations sufficiently articulated to permit meaningful judicial review.").

*Torres v. Astrue*, 2:10-CV-2489-RMG, 2012 WL 243086, at *1 (D.S.C. Jan. 25, 2012)

Further, in making his mental RFC assessment, the ALJ rejected the findings of state agency consulting psychologist Dr. Horn, who concluded that the plaintiff could perform simple, routine tasks (Tr. 27-28; *see* Tr. 136). The ALJ noted that Dr. Horn opined "to more severe limits" than what was included in the ALJ's RFC assessment (Tr. 27). The ALJ discussed Dr. Horn's finding that the plaintiff had moderate limitations in concentration, persistence, or pace and his opinion that the plaintiff could do simple, routine tasks (Tr. 27; *see* Tr. 135-36). The ALJ stated that he gave Dr. Horn's opinion "limited weight," finding the plaintiff "was quite capable of maintaining concentration and going into depth about her conditions" (Tr. 27). In giving Dr. Horn's opinion limited weight, the ALJ stated that he relied on the plaintiff's "mental longitudinal history" (Tr. 27-28) and specifically cited Dr. Thompson's consultative examination in support of his decision to give Dr. Horn's opinion limited weight, stating Dr. Thompson "noted only bereavement adjustment disorder and that opinion was consistent with the claimant's frame of mind at that time" (Tr. 28). However, this statement is in error because Dr. Thompson did not "note only bereavement adjustment disorder." Rather, he diagnosed both bereavement and moderate adjustment disorder with major depressive features (Tr. 403). As discussed above, he went on to opine:

> [S]he would have difficulty in a typical work environment maintaining pace and persistence in simple repetitive tasks for following more complicated directions as her stress coping skills appear minimal and psychological factors quite likely would intensify to the point that she would have problems staying on task and there would be frequent task interruption.

(Tr. 404).

The undersigned agrees with the plaintiff that the ALJ's decision that she can perform semi-skilled[3] work makes the ALJ's failure to state what weight was given to Dr.

---

[3]The ALJ found that the plaintiff could perform the "representative light *unskilled* occupations" of telephone solicitor, sales clerk, and driver (Tr. 29 (emphasis added)). However, as set forth above, each of the identified occupations have an SVP of 3, which corresponds to semi-skilled work. SSR 00-4p, 2000 WL 1898704, at *3. *See DOT* (4th Ed.,

Thompson's opinion particularly significant in this case. This coupled with the ALJ's rejection of Dr. Horn's opinion based, at least in part, on a mistaken reading of Dr. Thompson's findings, requires remand. Accordingly, the undersigned recommends that the case be remanded to the ALJ for further consideration and explanation of the weight given to the opinions of Drs. Thompson and Horn and particularly to their opinions regarding the plaintiff's limitations in concentration, persistence, and pace, in accordance with the above discussion.

### Drs. Chittum and Garber

In light of the court's recommendation that this matter be remanded for further consideration of Dr. Thompson's opinion, the court need not address the plaintiff's remaining issues. *See Boone v. Barnhart*, 353 F.3d 203, 211 n.19 (3d Cir.2003) (remanding on other grounds and declining to address claimant's additional arguments). The ALJ will be able to reconsider and re-evaluate the evidence as part of the reconsideration. *Hancock v. Barnhart*, 206 F. Supp.2d 757, 763–764 n.3 (W.D. Va. 2002) (on remand, the ALJ's prior decision has no preclusive effect as it is vacated and the new hearing is conducted *de novo*). Accordingly, as part of the overall reconsideration of this claim upon remand, the ALJ should also address the plaintiff's allegations that he failed to properly consider the opinions of treating neurosurgeon Dr. Chittum and physical therapist Dr. Garber (doc. 14 at 23-31, 35-37).

### Remand vs. Reversal

The plaintiff agues that this case should be reversed and benefits awarded outright rather than remanded for further proceedings (doc. 14 at 38). The undersigned disagrees. "The Fourth Circuit has explained that outright reversal—without remand for

Rev. 1991), available at 1991 WL 672624 (*DOT* # 299.357-014, telephone solicitor), 1991 WL 672554 (*DOT* # 290.477-014, sales clerk), and 1991 WL 672966 (*DOT* # 359.673-010, driver).

further consideration—is appropriate under sentence four 'where the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no purpose' " and "where a claimant has presented clear and convincing evidence that he is entitled to benefits." *Goodwine v. Colvin*, C.A. No. 3:12-2107-DCN, 2014 WL 692913, at *8 (D.S.C. Feb. 21, 2014) (citing *Breeden v. Weinberger*, 493 F.3d 1002, 1012 (4th Cir. 1974); *Veeney ex rel. Strother v. Sulllivan*, 973 f.3d 326, 333 (4th Cir. 1992)). This case fails to meet the criteria for a remand for benefits because the plaintiff has not shown by clear and convincing evidence that she is entitled to benefits. Accordingly, remand for further proceedings is the appropriate remedy in this case.

## CONCLUSION AND RECOMMENDATION

Based upon the foregoing, this court recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. § 405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

December 7, 2016
Greenville, South Carolina

26